2016R00573/DAG/CM

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Stanley R. Chesler |
| v. | : | Criminal No. 20-_____ |
| MAURIZIO PARLATO | : | 26 U.S.C. § 7206(1) |
| | | 31 U.S.C. §§ 5314 & 5322(a) |
| | : | 18 U.S.C. § 2 |

I N F O R M A T I O N

The defendant having waived in open court prosecution by Indictment, and any challenges based on venue, the Attorney for the United States, acting under authority conferred by 28 U.S.C. § 515, for the District of New Jersey charges:

## COUNT ONE
### (Subscribing to a False Tax Return)

1. At all times relevant to this Information:

### Individuals and Entities

a. Defendant MAURIZIO PARLATO was a resident of Florida and earned income derived from work performed in the United States.

b. Defendant PARLATO controlled a number of entities, including:

  i. Troystone, Inc., a BVI corporation, with bank accounts in the United States, among other places;

  ii. Lunazul Invest and Trade Corp., a Panamanian corporation, with bank accounts in Switzerland, among other places; and

    iii. The AMP Trust, a trust domiciled in the British Virgin Islands ("BVI").

  c. Company A was a manufacturer of luxury automobiles, primarily sports cars, based in Maranello, Italy.

  d. Distribution of Company A's automobiles to the western hemisphere was managed by Company B.  Company B was based in Englewood Cliffs, New Jersey.  Company B employed its own Chief Executive Officer ("Company B CEO").

  e. Defendant PARLATO served as the Company B CEO from in or about October 2002 to in or about December 2009.

  f. Company B supervised approximately 35 franchisees within Company B's geographical area (the "Company B Dealers").  Company B Dealers had to periodically renew their franchises with Company A.

  g. Individual-1 was an attorney in private practice in New York.

  h. Individual-1 controlled a number of entities, including Alpha Management International LLC, with bank accounts in the United Kingdom and the United States.

  i. Individual-2 was a watch dealer based in Florida.

### Company A & the Supercar

  j. Company A produced several highly-desired automobile models in small quantities (the "Limited Edition Automobiles").  The Limited Edition Automobiles were usually over-subscribed; that is, more customers wanted to purchase a Limited Edition Automobile than Company A produced.  Company

2

A frequently allocated specific Limited Edition Automobiles to its most loyal customers, often customizing elements of the cars to the customers' specifications.

k.  Company B executives, including Company B CEOs, had some measure of authority over the allocations of these Limited Edition Automobiles.

l.  In or around 2013, Company A announced that it was creating the most exclusive Limited Edition Automobile to date:  the "Supercar," limited to 500 units.  Each Supercar carried a manufacturer's suggested retail price ("MSRP") of approximately $1.4 million.

m. Company A sought to exercise some control over the aftermarket for the highly-prized Supercars, to prevent speculators from buying Supercars, instead of collectors, as Company A intended.

n.  Accordingly, Company A and Company B established a formula based on various criteria to allocate Supercars to Company B Dealers, and to determine which specific customers would be placed on the "Approved List" to buy a Supercar.

o.  Approved Supercar purchasers signed agreements to not resell their Supercars for 18 months unless the purchaser first offered to sell the Supercar back to the Company B Dealer at fair market value.  The Company B Dealers agreed not to resell Supercars for more than the MSRP.  If an authorized Supercar purchaser reverted their car back to a Company B Dealer, the Company B Dealers agreed to resell the Supercar to the next authorized purchaser on the waiting list at the original MSRP.

**Report of Foreign Bank and Financial Accounts ("FBARs")**

p. Citizens and residents of the United States who had a financial interest in, or signature authority over, a financial account in a foreign country with an aggregate value of more than $10,000 at any time during a particular year were required to file with the U.S. Department of Treasury a Report of Foreign Bank and Financial Accounts on Forms 114 and 114-A (an "FBAR"). The FBAR for any applicable year was due by June 30 of the following year.

q. The FBAR reporting requirement was separate from the additional obligation of a United States citizen or resident to indicate on the Schedule B of a Form 1040 Federal income tax return whether that individual had an interest in a financial account in a foreign country by checking "Yes" or "No" in the appropriate box.

**The Undeclared Funds**

2. Defendant PARLATO received various payments in connection with activities related to Company A, including after he ceased serving as the Company B CEO:

a. Notwithstanding Company A's framework for Supercar sales and resales, between 2015 and 2017 defendant PARLATO received $2,770,375.83 (the "Undeclared Funds") from Company B Dealers and Supercar purchasers in exchange for assisting them in:

i. Misallocating Supercars by, first, attempting to place purchasers on the Approved List outside of Company A's normal approval

process; and, second, channeling Supercars to purchasers who were never on the Approved List; and

        ii. Influencing the franchise renewal of a Company B Dealer.

b. The Company B Dealers then sold the misallocated Supercars for millions of dollars more than the cars' MSRP – up to approximately $2.6 million more per car.

c. The Undeclared Funds were income to Defendant PARLATO, but Defendant PARLATO failed to report the Undeclared Funds as income on his federal individual income tax returns (the "PARLATO Returns"). The PARLATO Returns therefore understated a substantial amount of the income that Defendant PARLATO had received.

3. Defendant PARLATO utilized the services of Individual-1 to hide the Undeclared Funds, including by creating entities domiciled outside the United States and by using multi-step, international transfers of Undeclared Funds to disguise the Funds' origins. Individual-1 was compensated differently by defendant PARLATO for services relating to the Undeclared Funds as opposed to the ordinary course of their professional dealings; as just one example, Individual-1 did not create or transmit invoices for legal services when dealing with the Undeclared Funds.

4. The Undeclared Funds were received by defendant PARLATO as follows:

a. Deposited in U.S. bank accounts held in the name of offshore entities;

    b. Deposited in undisclosed offshore bank accounts, including an account controlled by defendant PARLATO at a bank in Spain (the "PARLATO Spanish Bank Account"); or

    c. Received in the form of expensive watches, including watches provided by Individual-2.

5. After defendant PARLATO and Individual-1 caused some of the Undeclared Funds to be sent to the PARLATO Spanish Bank Account, Defendant PARLATO failed to report the existence of the PARLATO Spanish Bank Account on FBAR forms. Individual-1 retained some of the Undeclared Funds for Individual-1's own purposes.

6. On or about October 5, 2016, defendant PARLATO signed, filed, authorized the transmission of, and caused to be filed with the Internal Revenue Service a Form 1040, U.S. Individual Income Tax Return for 2015, on his behalf (the "Tax Return"). The Tax Return stated that defendant PARLATO's taxable income for calendar year 2015 was approximately $462,850. The Tax Return was signed by defendant PARLATO and contained a written declaration that it was signed under the penalties of perjury.

7. The Tax Return was not true and correct as to every material matter in that the return did not include Undeclared Funds—namely, approximately $1,456,640.48 in taxable income that defendant PARLATO had received in 2015.

8.     On or about October 5, 2016, in the Central District of California, and elsewhere, defendant

**MAURIZIO PARLATO**

knowingly and willfully made and subscribed a 2015 Form 1040, U.S. Individual Income Tax Return, which return contained and was verified by a written declaration that it was made under penalties of perjury, and which defendant PARLATO did not believe to be true and correct as to every material matter.

In violation of Title 26, United States Code, Section 7206(1); and Title 18, United States Code, Section 2.

## COUNT TWO
## (Willful Failure to File Report of Foreign Bank and Financial Accounts)

1. The allegations set forth in Paragraphs 1 through 7 of Count One above are repeated, realleged and incorporated as if set forth fully here.

2. During the calendar year 2015, defendant MAURIZIO PARLATO had a financial interest in, and signature and other authority over, at least one financial account, having an aggregate value exceeding $10,000, at Banco Sabadell, a bank in Spain.

3. On or about June 17, 2016, in the Central District of California, and elsewhere, defendant

**MAURIZIO PARLATO**

did knowingly and willfully fail to file with the U.S. Department of the Treasury a Report of Foreign Bank and Financial Accounts on Forms 114 and 114-A that disclosed that he had a financial interest in, and signature and other authority over, a financial account in a foreign country, namely, a Spanish bank account at Banco Sabadell, which had an aggregate value of more than $10,000 during the year 2015.

In violation of Title 31, United States Code, Sections 5314 and 5322(a).

*Rachael A. Honig*
RACHAEL A. HONIG
Attorney for the United States,
Acting Under Authority
Conferred by 28 U.S.C. § 515

| | | | | |
|---|---|---|---|---|
| Case Number: 20-_____ <br><br> **United States District Court** <br> **District of New Jersey** | UNITED STATES OF AMERICA <br><br> v. <br><br> MAURIZIO PARLATO | **INFORMATION FOR** <br><br> 26 U.S.C. § 7206(1) <br> 31 U.S.C. §§ 5314 & 5322(a) <br> 18 U.S.C. § 2 | Rachael A. Honig <br> Attorney for the United States, <br> Acting Under Authority Conferred <br> by 28 U.S.C. § 515, <br> for the District of New Jersey | Dara Aquila Govan <br> Catherine R. Murphy <br> Assistant U.S. Attorneys <br> Newark, New Jersey <br> (973) 645-2700 |